The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning, everyone. We're prepared to hear argument in number 19-2327, Cardenas-Martinez v. Garland. And Mr. Chang, we are pleased to have you and you may begin when you're ready. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Frank Chang for Petitioner Elvis Cardenas-Martinez. I reserve three minutes for rebuttal. Elvis came to the U.S. as an unaccompanied child. He suffers from epilepsy and a cognitive disability so severe that the North Carolina State Court found him incompetent. Although Elvis's lawyer, Ms. Moss, had ample indicia of these conditions before the immigration court hearing, she failed to seek procedural safeguards and raise substantive disability-based arguments like a reasonable attorney would have done. The Court should grant Elvis's two reasons. First, as to the issue of new evidence, the Board failed to explain why the new state court order of incompetence and Dr. Fellier's diagnosis were not material. That unexplained conclusion requires a remand under Chenery and Ken. Second, as to the issue of ineffective assistance of counsel, the Board erred in finding that Ms. Moss's performance was neither deficient nor prejudicial. That was an error. Ms. Moss prejudiced Elvis by failing to raise critical procedural and substantive arguments, especially given that her client was incompetent and had a visible disability. First, I would like to turn and begin with my new evidence issue. Even though this is a second argument in our brief, this is a rule on the ineffective assistance issue. The Court had to send it back because the Board failed to explain why it rejected Elvis's new evidence. In support of his motion to reopen, Elvis submitted two pieces of evidence that were previously unavailable at the time of the removal hearing. First, Dr. Fellier's medical report confirming Elvis's cognitive disability, and two, North Carolina's state court order finding Elvis incompetent by clear and convincing evidence. Elvis asked the Board to reopen. How did the new evidence with respect to mental competency speak to the issue of whether the petitioner was able to understand proceedings at the time of the removal hearing? As a general matter, when you assess competency, you are assessing it at the time of trial in the case of a criminal case or at the time of a criminal case. I have two responses to that. First, as a preliminary matter, I think your question goes more to the substance of the materiality analysis. Our primary argument with respect to the new evidence issue is that the Board failed to explain why the new evidence was not material. So, we don't know what the Board's position is on this issue, and we'll have to send it back for the Board to give a reason why. The second, more directly to your point, Your Honor, and again, it's not directly before this Court, as to the inclusiveness that confirms the indicia that were available at the time of the hearing. So, if I may just briefly explain what Dr. Fairliew found. Dr. Fairliew found that Elvis has severe problems with his executive functions, and it's severely impaired. He's not thinking at a high school level, even though he was 18 years old at the time of the hearing. Well, let me ask you this, counsel. If the statute were a general disability statute, I can understand your point. But even with the new evidence, how does that relate? How does that resolve the problem here under the specific terms of the asylum statute? Because you'd still, in a motion to reopen, have to prove that you were a member of a particular social group, and that that was a nexus between the disability that you're claiming and any sort of persecution. So, while as an abstract matter, or as a general matter, and as a concrete matter, I'm certainly sympathetic to anybody that may be experiencing seizures, so it's not a question of that at all. But it is a question of how this fits into the terms of the asylum statute, both to the presence of persecution and to whether the persecution was somehow caused by the disability. Thank you, your honor. So, two responses again to that. I think the more substantive analysis part of Elvis' asylum claim, I will address that as we talk about the prejudice caused by the ineffective assistance. However, as to the new evidence and the Chenery issue, what we're concerned here is that the board gave no reason why. The board simply, if I may direct your honors to Administrative Record page 6, that contains a paragraph purporting to analyze the new evidence issue. However, there is only one sentence by the board asserting that the new evidence would not have changed the outcome. And we simply are not in a place to review the agency action because the agency gave no reasons why. Counsel, this is Judge Harris, and I do understand what you're saying, and it's a very conclusory sentence. But I did have, I think my question relates a little bit to Judge Wilkinson's question. It just seemed to me that it's fairly evident that what the board meant was, look, there may be more evidence of intellectual disability now, but that wasn't the grounds on which the IJ denied asylum. The IJ said there's no nexus. And if this is a nexus case, I actually, it seemed pretty clear the board was just saying, look, you have more evidence going to the IJ than the IJ rested. So why isn't there enough here for us to kind of see the agency's path under Chenery? So I think the problem here is that the board did not consider the conclusiveness of the diagnosis that Dr. Failure provided and that what the North Carolina State Court found based on Dr. Failure's diagnosis. But why does that make a difference to the nexus analysis? So we think it matters. So this kind of blends into the prejudice analysis, and I'll move on to that right now, Your Honor, and address the prejudice as to sort of the MAM issue and the mental incompetency. So we believe, so Elvis was prejudiced by the simple fact that he testified on stand, and the IJ's denial of the nexus was grounded in his own testimony. And during his whether the gangs would hurt him or anyone with a disease like him. And so in essence, Elvis himself, being an incompetent person who should not have testified in an adversarial hearing, testified thereby prejudicing his own nexus argument. And had there been a more robust request for MAM safeguards, one of the things that the immigration judge could have done is allow Elvis not to testify and allow Elvis to proceed simply on the basis of With respect to the MAM safeguards, what more did you want than the IJ already gave you? One of the big MAM safeguards is that you get to raise the issue of competency. But as I recall, the record in this case, both the people who were best able to judge competency would be both petitioners on counsel and the IJ. The IJ conducted an petitioner here was oriented as to the proceeding and counsel and interviews found him to be engaged and attentive. And so I'm wondering with respect to the MAM safeguards, which they go to the issue of competency. And I'm wondering whether on that issue, why we should override the views of both counsel and the IJ that he was competent and was attentive with respect to the removal proceeding. Why they're the ones that are in a much better position to judge and they actually explored the very issue that the MAM safeguards speak to. Certainly, your honor, I have two answers to that. The first is that I respectfully disagree with your characterization that what the IJ did here conformed with what MAM requires. As Elvis submitted in his first 28-J letter back in May 2020, there was a 9th Circuit decision that basically found problematic a similar kind of series of review of available record at the time. And here the IJ didn't even have the time to review the evidence. Ms. Moss made no motion. So the IJ simply relied on the question. And even the questioning itself was problematic because there Elvis could not understand the adversarial nature of the proceeding. He thought that the DHS attorney was there to assist him in his case, even though she was there to prosecute the case against him. The second point is more important is that we're not directly concerned with the IJ's actions here, although we are concerned with it. We are primarily focused on what Ms. Moss should have done and what a reasonable attorney... Counsel, this is Judge Harris. I just want to clarify one thing that you just passed on quickly. So whether the IJ was right or not about competency that's not actually, that's not really, that wasn't in front of the DIA on reopening and that's not in front of us, right? I think I'm just saying what you were about to say. What's in front of us is just the ineffective assistance claim, but there's no challenge in this posture to whether the IJ abused discretion in finding competence. Is that right? That's absolutely right, Your Honor. Okay. And what a reasonable attorney would have done when she has witnessed this confused colloquy between the immigration judge and her client. And also in addition to that, Ms. Moss herself even had submitted prosecutorial discretion requests to the DHS based on Elvis's mental frailty. I mean, she noted to the government, this is three weeks before the hearing, she noted that Elvis has some mental issues, is frail. It required a further examination to know what's truly wrong with him and that the asylum interview with the government didn't go well because of his conditions. I mean, a reasonable attorney in that situation going into a removal hearing and just witnessing a confused dialogue with the immigration judge would have objected, would have moved for MAM at the time, but Ms. Moss did not do so. Can I, I don't want to take you off course, but if I could just go back to your first argument for one minute about the new evidence and the failure of the explanation. Given that I now better understand, we are not directly confronting the question of whether the IJ was right or wrong when she found the petitioner was competent. So what is the relevance of new evidence to what we're looking at now? It can't really go to ineffective assistance because it wasn't in front of counsel at the time. You know, counsel didn't have access to that information at the time. And since we're not looking at the correctness of the competence determination and because it doesn't bear on nexus, what would be the relevance of that new information? No, thank you for that, Your Honor. So there are essentially two separate, there were separately two, essentially two separate motions to reopen before the board. They are independent and alternate, independent of each other. And so the motion to reopen based on new evidence would stand or fall on its own without any relevance to, without any reliance on the motion to reopen based on ineffective assistance of counsel. And instead it's the same going the other way to the motion. Right. But even if we thought that information had some bearing or relevance on whether or not petitioner was competent at his hearing, that question is not in front of us. That's correct. So the information would have to be relevant to something else about the asylum claim. Correct, Your Honor. Okay. And that goes to the materiality which the board cannot analyze or explain. And if I may just briefly address the time. I want to just follow up on Judge Harris's question because I think the underlying difficulty that you have is that under the terms of the asylum statute itself, and that's what you're motion to reopen an asylum determination, there seemed to me to be several problems with it. One is a particularity problem as to how this gentleman fits into the particular social group and what the particular social group is. And then the other is what Judge Harris has identified as a nexus problem. You know, where is the persecution to begin with? And how is the nexus requirement satisfies that we can assure ourselves that the persecution, whatever it was or might be, was undertaken on account of some protective characteristic. So the problem is that the underlying asylum case is vague. And it doesn't map onto, it doesn't easily map onto the terms of the statute in terms of particularity and in terms of persecution and in terms of the nexus that the persecution bears to a protected characteristic. And that I think, because it's not that you don't have a sympathetic client, you certainly do, and I think we would all respect that. But in terms of the statute, the underlying case seems to me to have some gaps on nexus, causation, particularity, the name of the actual presence of either past persecution or a reasonable fear of future persecution, all of these things, they are question marks. And that's where I'm having basic difficulties. You see what I'm saying? Absolutely. I see that. I'm over time, but if I may help to address those points. Yes, you may. You also have time for rebuttal, but why don't you go ahead and address the point now, too? Yes, Your Honor. So I'll be brief. As to the particularity concerns that you raised, with respect, ATIMU is a binding decision in this court. And as this court interpreted the asylum statutes in ATIMU, and the particularity can be specified to specific illnesses that end in visible disturbances, that end in erratic behavior. And there's a reasonable likelihood that Elvis can muster up enough evidence and arguments to show that his conditions are similar. It ends in erratic behavior that's visible to other people that's going to cause prejudice to people who don't understand what epilepsy is. And as to the persecution and the nexus and all of those issues, Your Honor, that's all included in the record as well as the blue brief. For the record evidence, I would just direct Your Honor's attention to AR pages 57 to 61. It's an exhibit list in support of the motion to reopen. Contains country condition evidence showing how mentally ill people are being stoned to death. And they're labeled loquito and they're often liquidated. I mean, there's an instance of a person getting burned because they're mentally ill. All right. Well, thank you very much, Mr. Chang. And as I mentioned, you have some rebuttal. And Judge Wynn, do you have any questions? Or Judge Harris, do you have any further questions of Mr. Chang? I simply wanted to, when you come back on rebuttal, as I look at this case and what is here, it is the ineffective assistance of counsel claim that you make. Dealing with this attorney's failure to seek the procedure safeguards that are guaranteed to mentally incompetent noncitizens, if we turn to the board's decision, the formal decision, a matter of MAM, it just seems to me that's a particularly strong argument. I'm not putting the team or even with the new evidence, but the new evidence is, you know, it may or may not be there, but simply the attorneys of the performance in this case, there are particular cases that deal directly with this. And I, it looks rather abject to me, but when you come back, if you will focus more on that, I would appreciate that. Thank you, Your Honor. And Judge Harris, do you have any further questions of Mr. Chang? No, thanks. May it please the court. I am Sarah Byron, appearing on behalf of Merrick B. Garland, the United States Attorney General. Did the board abuse its discretion in denying reopening based on alleged ineffective assistance of counsel or the proffer of non-influential new evidence? In both cases, the answer is no. Petitioner was not deprived of a fair hearing or was prejudiced, particularly because the immigration judge conducted a competency hearing consistent with MAM, which petitioner has never challenged and can no longer challenge because the time for a petition for review of that position has run. In fact, petitioner's claims on appeal face two hurdles. One of them being that petitioner was given the competency hearing by the immigration judge. And the other is that he never explicitly identified the safeguards he believes he should have received. The only one he consistently alludes to is having her mother- Counsel? Yes. Counsel? Yes. I'm sorry. It's Judge Harris. You've already talked very briefly about the prejudice question, but could you address counsel's actual performance at this hearing, which seemed to be where the BIA was focused? And the BIA seemed to be of the view that because after these proceedings started, counsel filed a letter saying, I had no reason to think there were any cognitive impairments. That was sort of good enough to show that there was no deficient performance. Notwithstanding the fact that about two, three weeks ago, she had written a letter saying, no, he had all kinds of cognitive impairments. He's a child. He can't possibly do something like this. And the BIA never addressed that. So is the government's position that the performance here was okay or not? The government's position is that yes, that petitioner's opposing counsel, excuse me, that petitioner's formal counsel's performance did not prejudice him or render the hearing unfair. And this is for a couple of reasons. First, because the immigration judge gave that MAM hearing, that really takes the wind out of the sails, I think, of the ineffective assistance of counsel claim, because he essentially received what he's claiming he should have received. And, you know, excuse me, counsel, is your emphasis on the performance prong or the prejudice prong? Which one of those do you lay the most emphasis on? Well, both of them at the hearing were acceptable. And if I had to choose one, I would say the prejudice prong, because there's no evidence in the record that he was prejudiced because he got the hearing by the immigration judge. And the petitioner sought to present this asylum claim and his counsel reasonably assisted him in presenting this claim where, remember, he's the only individual who has any evidence and knowledge of the asylum claim that he's trying to... Well, so it would seem to me that the prejudice prong, as you explained, it has two aspects to it. One aspect of the prejudice prong is a procedural aspect, and you're making the argument that the IJ did indeed provide at least one of the MAM safeguards by virtue of the colloquy. And the second prejudice prong is more of a substantive prejudice prong, which goes to the infirmity of the underlying case with respect to nexus and particularity and causation, which is, I guess, another way of saying nexus. So as I understand the prejudice prong, it has both a procedural and substantive aspect to it, does it not? That's correct. But he also wasn't prejudiced in a substantive manner because for two reasons. One, when you look at the hearing transcript, it's clear that he was able to understand the question being asked and to give a responsive answer. His testimony doesn't conflict with his affidavits. The immigration the safeguard that petitioner alleged most frequently, petitioner should have gotten, was that his mother should have testified on behalf of petitioner. But it's hard to see how his mother testified instead of petitioner. Counsel, can you hear me? Counsel, excuse me, Judge Wynn has a question. Can you hear me? I can, yes. I wasn't sure you kept talking when I was talking. Well, I know we can hear you. Well, can you hear me now? I can, yes. Thank you. So we are talking about the IJ's hearing and if you look at what he actually did, these are mostly leading questions, yes or no. And let's be clear now, everything is indicated, if you move outside, this guy is absolutely incompetent mentally. Let me just tell you right now, I'm looking at the medical records, I'm looking at all the testimonies, the experts, that's there. You have an IJ who conducts a minimal hearing, yes, no questions, and he never looks at those medical records. That cannot be enough to satisfy MAM. You go to the mother in the instance. The counsel's answer to why the mother can't testify is she has hearsay. Well, that's not relevant. Hearsay is admissible in these type of hearings. We know this. But the mother knows this young man, even the judge himself asked this counsel, why didn't you call the mother to do it? Only he testifies. This does not shed any light on whether this petitioner actually understood the nature and the purpose of the hearing. It's abominable what occurred here. This counsel was as deficient as I've ever seen. She did absolutely nothing. And she knew this, as Judge Harrison pointed out, she's already said it. Then she should come back and refute and say she didn't say it. But this evidence is, the evidence would replete that this guy had a mental problem. And the rules are fairly well set that when we're dealing with a non-citizen in these type of situation and competency becomes an issue, there are safeguards. And we as judges can't just, I mean, we could nuance this and figure out all kinds of procedural ways to get around it. But the facts, as Judge Wilkinson recognized, are rather stark here. And I don't think we are so hammered, so restrained as judges, we have to shut our eyes to what these facts lead to and what actually occurred here. It was a minimal hearing. It was nothing but yes-no answers to someone who then barely understood. Obviously, in a previous hearing, they had to dismiss it because they said he wouldn't answer the questions. He said nothing. He just sat there and just starved. And so this is where we are. The question here is, is that enough for MAM? Well, with all due respect, the immigration judge was aware of petitioner's medical records, which is why... Tell me where that is indicated in the record. Tell me where that is indicated, that immigration judge took in consideration what is in those medical records. In the transcript, she does indicate that she is aware, which is why she on her own affirmatively undertook a competency evaluation of petitioner. I would note, though, that that, as opposing counsel has stated... Now, when you say she undertook a competency evaluation, we're talking about a hearing now, evaluation, you're certainly not referring to any type of expert evaluation. You're simply talking about a procedural hearing in which he's afforded an opportunity, but there's no evaluation that is eligible. The medical records speak for themselves. The immigration judge conducted an inquiry that was consistent with MAM, but that issue isn't before this court because the petitioner has never timely filed a petition for review of that decision of the underlying merits. So to the extent that... Duty on a lot of folks there, and it's not just this counsel in there. This IJ received these records at the beginning of the hearing, and less than 10 minutes later, she finds him competent. So you're telling me she reviewed over 100 pages of record in that time, and the IJ received the records for the first time at the beginning of the hearing. She only knew of the fact that those records were in the substance. The immigration judge, according to the transcript, went through and conducted it consistent with MAM, and I appreciate your frustration, but unfortunately... I don't want to express frustration. I want to deal with the facts. Let me make sure we are in agreement. She did just receive those records just at the time of the hearing. At the time of the hearing. 10 minutes later, and 10 minutes later, she found incompetent. Is that correct? I don't... I think the important thing is that there wasn't a... No, I want to deal with that because you say that this is frustration. I want to deal with facts. Please, please let me... Let's deal with facts. I don't want to deal with frustration. I want to deal with facts. The fact here is she received these records at the beginning of the hearing. 10 minutes later, she gives a competent determination. That's 100 some odd pages, and there's nothing there to indicate that she actually knows the substance of this. She reviews them for the first time at the hearing and then gives the competency determination. And by the way, counsel... None of this is coming from counsel. I'm just dealing with facts. I'm not dealing with frustration. I don't want to deal with something about it. This is not frustration. I'm dealing with the facts here of what this woman did. She gets up and she answers these questions to determine his competence. She says, do you understand what the proceeding is about? He says, yes. And that's it. There's no one in the record... Maybe like... Clearly, he's mentally incompetent. And you... Counsel, maybe the reason that the hearing was or the dialogue and colloquy was undertaken was because in reviewing the medical records, there was enough to persuade the IJ that I want to make sure of this and I want to satisfy myself visually in my own mind that this individual knows what's going on. But beyond that, I think it's important... Well, Judge, before we proceed in the back, let us make sure we're in agreement because you've used the term she reviewed the records and she came to this. It is quite clear she only received these records at the time of hearing. If she reviewed it, it was only to get a light on. She has no knowledge of the substance of those hundreds of pages under there. And if you look at the pages, there's no reasonable IJ that would not go further. I just want to make sure we're clear on that because I don't want to gloss that over as though, well, she reviewed the records. Yeah, on the whole record, if we look at it, that's what it looks like. Let's say that the record's bound to her to undertake the colloquy. But beyond that, the point I was going to make was that I think it's always useful to ask who bears the burden of proof on these ineffectiveness claims. And it is clear that the petitioner bears the burden of proof both as to the competency prong and as to the prejudice prong. And if you bear the burden of proof on the prejudice prong, you have to submit, it seems to me, evidence that counsel's performance in some way prejudice the petitioner's case. But even on this appeal, I still do not understand with any precision what the persecution was, how the particularity of the particular social group should be defined, what the nexus was. All of these things are essential to establishing an asylum case. And the petitioner does bear the burden of addressing each one of those three factors, which are shortcomings in the asylum case. And I don't see in the record that those qualms about how this maps onto the This isn't a matter of frustration. It's a matter of the facts and a matter of the law. And I am still scratching my head as to how this makes out an asylum case. And if there's not so on two or three months, I don't see where the prejudice attaches. And it is a question on which you know, sometimes in these immigration cases, you feel, I mean, I feel at least pretty, pretty torn because as a general matter, the so many of these cases have very sympathetic elements, and this is surely one of them. But at the same time, the asylum statute, as we've said many times, is not a general hardship statute. If it was a general hardship statute, I would say, well, this individual has, it appeals to my sympathies and tugs at my heartstrings. But how do I get to it as a matter of law? And that's basically where I'm having a dipper coffee. You know, I want to add also to Judge Wilkerson's statement, I agree, there is a burden of proof regarding ineffective system of counsel or asylum. He doesn't have a burden of proof that he's held to show he's competent, though. That's a whole different matter there. So when IJ undertakes this hearing to determine, there's no burden on him to show he is competent at that point. There is a whole different ballgame. And here, when you have an IJ that has all these medical records before them, and we're dealing with the MAM, which is I think if we focus on that particular board president here, at least for this hearing, that's the kind of safeguards we're talking about. And when we get into the whole business of asylum, there are certain things that we take at least in the determined from the beginning. One, he claims he is a part of a social group. He's part of the Honduran children lacking effective parental familial protection. And those who suffer from epilepsy or seizures and children who are disabled and who lack effective parental familial protection. And so when you move from that, whether we're going to make that determination at this point or not is one thing. But the determination of whether or not the competency is there is clearly before us. And so what that leaves us and why these are simple. Send it back. Let's do this thing right. This young man is by all accounts incompetent. And somebody didn't do their job. It's very obvious this council was deficient in so many ways. And there are burdens that AMAI placed on the IJ as well. It's almost like an angus type thing with us on criminal cases. You can't just sit back and conduct a hearing with blind eyes and get a medical record in that's 100 and some odd pages and then blow through it in 10 minutes and say, okay, he's confident and this guy is barely answering any questions. You're asking, yes, no questions. And then it comes up to here and then we look the other way and wait until, well, it's not prejudice. We didn't do this. Clearly, clearly there's something wrong with this case. If I could just respond to that with a couple quick points. First off, it's important to keep in mind also that petitioner has never disavowed any of his former testimony, any of his former statements. He's never explained how his testimony would be different, what he would have said that was different, what events weren't described accurately or meaningfully. In his claims, he's never changed any of his former testimony, took issue with any of it, never disavowed any of it, and never quibbles with any of it, first of all. And second of all, if we look to the safeguard that he keeps talking about, that he says that he should have gotten, if my time is finished, if I can continue just briefly, if we go back and we look at the safeguard that he raises most often, and he never explicitly identifies, clearly, I wanted this safeguard, this safeguard, this safeguard, this is what I should have got, and this is how it would have changed it. He never sets that forth. The safeguard he says most often is that he would have been excused from testifying and his mother would have testified on his behalf instead and presented his claim. Admittedly, it's hard to see how his mother testifying on his behalf would have presented a stronger claim or would have resulted in an asylum grant, mainly because his mother wasn't in Guatemala for the duration of petitioner's in Guatemala. She has no evidence, direct evidence, she wasn't there for his life in Guatemala. She doesn't believe some of his claims about the abuse that was suffered by his aunt, which, you know, moreover, has a nexus issue there, but she doesn't believe his claims with his aunt. She lacks the knowledge, and so it's unclear how his mother testifying would have established a claim when she didn't have direct evidence or knowledge. Excuse me? Just barely. Really? Can you hear me now? Yes, that's better. Can you hear me? Yes. Okay, I haven't moved or anything. Okay, here's my question. What is your understanding of the grounds on which the BIA itself denied this claim? We have to review the BIA's decision, and I feel we've been having a very wide-ranging discussion about prejudice and performance here. What is your understanding of the decision by the BIA that we are reviewing? I read that decision and I see much discussion about why counsel's performance was not inadequate, and I see much less about prejudice, and I don't see anything about, well, even if he had prevailed upon the IJ to give him the accommodations that we're talking about where he doesn't testify and the mother comes in to testify, that wouldn't have made any difference. What is it? You know, we the BIA's theory. So what is your understanding of the grounds on which the BIA rejected this claim? Are we talking about his new evidence or the ineffective assistance of counsel claim? No, I'm talking about the ineffective assistance claim. Well, the board, in its decision, does go through a number of things. They do talk about the fact that the petitioner argues that she provided ineffective assistance of counsel by failing to bring his mother into the hearing, and they... I'm sorry, counsel, can you hear me? I can. Can you hear me, counsel? Yes. Great. So I'm not talking about the claim of ineffective assistance for not bringing the mother into the proceedings. Okay. I'm talking about the basic claim of ineffective assistance for failing to leave the NAM safeguards, to ask for the safeguards. Yes. What is your understanding of the ground on which the BIA rejects that claim? Well, one reason that the board has rejected that claim was because they, and I'm just pulling out my decisions, was that she got the hearing, he got the hearing from the immigration judge, and that going further than that, that petitioner doesn't actually show that he was prejudiced by not having her ask for those safeguards. And the board gives three, they talk about the mother and the hearing, and also to move and things like that. But the board explicitly says that petitioner wasn't prejudiced by not explicitly asking for the MAM safeguards because of the mother testifying, and also because of the fact that the immigration judge had done that competently. Well, I want to ask a question regarding that. So in the opening brief of the petitioner, he states that he would have asked to have his testimony waived because the most So he would state that his testimony was not helpful, accurate, contrary to his counsel's claim. And had this mother or other witnesses, including experts, testified on his behalf, there's a reasonable probability he could show at least a 10% chance of being persecuted on account of his membership in a particular social group defined by cognitive abilities or disabilities. So I think when I see a case of this, I see a case of a, let's say, a reasonably competent attorney would have solicited expert testimony regarding the petitioner's conditions and the conditions in Honduras. And that happened in Timuc. There were two experts who testified in that case that provided crucial support for the petitioner doesn't need to show a conclusive showing here. The prejudice standard is akin to strictly. And where there's a probability sufficient to determine, undermine the confidence in the outcome, I think the answer is clearly yes. And so given his significant disabilities, and the fact that his testimony is the only basis for his claim, he has significant disability, and his testimony is the only basis, I think the lack of safeguards undermines the confidence in the outcome. We've spoken of prejudice. I think there it is. Then with respect to that, though, specifically on the nexus point, though, I mean, first of all, it's hard for me to see, and petitioner hasn't really, I don't think, how having his mother testify instead of him when his mother wasn't there for 14 years, they never lived together, how she can more effectively present the claim she wasn't there for. But with respect to that. The larger point, though, I think in addition to that, is that you're going to bring forward, if you have the burden on prejudice, you have to have some specificity to what you would have done differently, both with respect to what evidence would there have been of persecution, what evidence would there have been that the persecution bore some sort of nexus to disability. And you have to be at least somewhat specific on that. You can't just say, I would have done it. You would have said, well, here are the experts we would have brought forward. Most of the cases on prejudice, where we found a reasonable probability, have been much more specific as to prejudice than this one is. And you have to say, look, here's the difference it would have made. And you have to be at least somewhat concrete and to present, at least to give the court some reason to believe that there's a reasonable probability. But that's one of the things that's lacking here. And that is, exactly how is all of this going to make a difference? I mean, we've talked about this and we've talked about that. But at the bottom of it all, even if you assume arguendo, that there was a failure on the performance prong, how is it going to make a difference? And you can't just say, well, it might have, it would have, I mean, there's got to be something concrete. Well, I think that's exactly right. I think Petitioner says the safeguard that I would have gotten is my mom would have testified instead of me. But they never explain how the mother's testimony would have established the asylum claim for him, particularly when she wasn't around. But I want to be clear in terms of where we are here. And when we're looking for specific prejudice, if you have an individual and that individual is the only person who testified, and then he says, well, you know, I want that to be weighed because it is the critical part here, the critical prejudice is the fact that he himself testified. And he has disability, he has cognitive disabilities proven right there. And so what he's telling you is that there is a, as in Timo, go to Timo. Timo, we are bound by two expert witnesses provided that critical support for the petitioner's asylum eligibility and a showing of nexus. There it is. It's in Timo, and we are bound by that case. A reasonably competent attorney would have solicited expert testimony regarding the conditions and the conditions in Honduras. So the petitioner, as I said before, doesn't need to show a conclusive showing here. He needs only show a probability sufficient to undermine the confidence in the outcome. And there's the answer. Given his significant disabilities, he's the one testifying. It is his testimony that's going to this claim. And if we do the safeguards on the MAM, there it is. There's that specific evidence you're looking for. There's the prejudice you're looking for. It is unlike other cases, because this individual has significant cognitive disability, and it's his testimony. No one else. Doesn't call the mother, and while you put down the mother's testimony, it's done all the time in immigration cases. There's no rules of evidence controlling what she's saying. Who else knows more about this young man than this woman, who is in the house with him, can testify to his cognitive abilities, can testify as to what even immigration judges pass it as. You can dismiss it all you want, but these cases, no competent attorney would not have called this mother to the stand from that perspective. So it's not like her testimony is a throwaway that, oh, what can she say? She doesn't know anything about Honduras. She can say what other witnesses can say. She has a better view of it than the immigration judge in terms of things that are going on there, and it's evidence that would be helpful in terms of the outcome here. Judge, with all due respect, I'm not saying that her testimony wouldn't have been helpful, but it would have been the only testimony of his claim, discounting experts who, you know, that's an expert testimony, because it's not as if she would be testifying in addition to petitioner. She would be testifying in his claim. Well, if you understand what I'm saying, we're dealing with petitioner's testimony. That's where we're probably having our little disagreement here, and with respect to my good friend Judge Wilkerson, and that is petitioner's testimony. He has the cognitive disabilities. He doesn't understand anything from what the medical records are showing here, and he's getting these leading questions that are coming there, and you look at the whole record here, and you determine it is his significant disabilities, and the fact that his testimony is the only basis for it, that you then come to conclusion that the state has been undermined in terms of the competence of this outcome. That's all you need. You don't need a conclusive statement. If I can just add two final points. One is which I think it's important to keep in mind, too, that petitioner was an adult, and I understand that he has, that there are these other issues at play, but he was an adult at the time that he expressly indicated to his counsel many times that he didn't want his mother to testify. He didn't want her in the courtroom. He had a relationship with his mother, so that also plays into this situation, and in petitioner's former counsel's representation of her client in that he specifically indicated many times that he didn't want her to testify, and so that has to be, you know, looked at as well, and I would note that Keith's medical records, petitioner's medical records, do indicate that his mother lacked knowledge about his medical, social, or developmental history, so. Does it matter if he's an adult? Let me ask this question. If he is incompetent, does it matter that he's an adult? Well, he, at the time of his hearing, he could make decisions, and I think that. Well, I understand you say that, but nothing in the record says that. Nothing in the, no medical record, no expert has said that. You said it, and maybe some judges have said it, but it's not in this record. But there's also, there isn't evidence that he was, you know, 100 percent incompetent, that he couldn't make any decision of his own, including, I didn't, I don't want my mother to testify. She doesn't believe some of my claims, and so I don't think that that is something that can be easily discounted. Even if you consider some of his conditions, he was an adult at the time, at the time of the hearing, he was, did not exhibit indicia of incompetency such that he was unable to coherently, you know, get his claim, proffer his claim, and indicate and express desire that he didn't want his mother to testify. I just wanted to mention one quick thing about Well, the broader point is that we can't engineer all of these things on appeal, and we're trying to say that, oh, well, he's incompetent or whatever. The people that had the best view of this thing were counsel and the IJ, and, you know, there's nothing to say really that their assessment of was incorrect. We can say, well, we have this circumstantial, they should have done this, they should have done that. The fact that they had eyeballs on the question, and we don't, and we're trying to do all of these things from an aerial perspective, from way up, and we're trying to overrule the combined judgment of the IJ and counsel who are in the best position to When you get into the prejudice prong, there are even more hurdles. But, you know, it seems to me we're going around and around and around on this, but if Judge Wynn has any further questions, I'm certainly prepared to hold off and let him ask whatever questions he may have. Judge Wynn, do you have some further questions or comments you wish to make? Thank you, Judge Wilkerson. I'm confident we have, we've fleshed out our differences here. I don't think we've gone round and round. I don't think it's so evident that this is, when you look at the record, the medical records of what's in this case right now, one could, if you did not look at anything else, pass out the very, very new evidence to show this is competent and proceed on. And I think that's what's happening here. I don't think it's a round and round thing at all. I think it's just a matter of, we are court, we're judges, we ought to do what we need to do. It needs to be a fair proceeding. We ought not tolerate this, and we need to move forward. But I thank you for giving me this opportunity and due respect to counsel. I know you're doing your job, but it's not frustration, it's the record before us. And I think Timo controls this thing, and I also think MA controls the ineffective. Judge Harris, do you have some questions you would like to ask? No, thank you. I just wanted to- We don't have any further questions. Oh, judges, your honors? Yes, ma'am. I just wanted to say that I know a petitioner has raised pastoral discretion. I know that and we're in a new administration now. And so we have, obviously, as you all know, there's some different priorities that are happening. But petitioner hasn't come forth recently, as far as I know, about prosecutorial discretion. And I'm just putting out there that that's obviously a request that can be entertained at any time. So if that's of interest- I didn't hear that last statement was what? The prosecutorial discretion to say that, to the best of my knowledge, petitioner hasn't re-raised that issue with either our office or the Department of Homeland Security, and just putting out there that that's a request that can be made at any time. All right, thank you. Mr. King, you have some time for rebuttal, so let's hear from you. Thank you, your honors. With respect to the last comment by my friend on the other side, we are concerned with this record and what happened in this case with Ms. Moss. The new PD request is not relevant to this case. And I just want to address Judge Wynn's last question to me. I'd like to point, your honors, to the Third Circus decision in Sataga from 2007. I think that'll help the court with how to analyze prejudice. And like Judge Wynn noted, there was a specific prejudice in this case as to MAM issue, which is that Elvis ended up testifying. Once we remove that prejudice, I think there's a reasonable possibility that the outcome was different. And Sataga supports that outcome as well. In Sataga, the specific prejudice was unfavorable credibility finding, stemming from inconsistencies in evidentiary submissions, which was prepared by a law student and not even reviewed by an attorney in that case. And the Third Circuit said that once you remove that critical prejudice, there's a reasonable likelihood that the outcome would have been different. But I'm still, you know, I still come back to the same basic point. I don't understand what difference all this would make. I don't understand what exactly the persecution was, and I don't understand how the persecution was on account of membership in this proposed social group. I just don't understand. I don't understand what evidence you would have put on, what experts would have been put on. I don't understand what basis there is to identify. I don't understand how you would, if you've got all the relief that we gave you, that you're requesting from us. I don't understand how you would establish the persecution. I don't understand how you would connect the persecution up with the membership in a particular social group. And sometimes it's a hard thing to stick with what I think are the textual mandates of the law in the face of what is clearly a sympathetic case. If I could rule with my heart, I would rule with you, but I cannot. I have got, you know, I took an oath to follow the law and the terms of the law and the terms of the statute, and I don't understand how you could make what you would do to make the case under the statute as to past persecution, likelihood of future persecution, how that relates to disability. You know, if that were for me, fine, but I don't see it. If I may briefly conclude your honor and respond with respect, I point your honor to Blue Brief pages 44 to 46, where we discussed that issue, as well as administrative record pages 57 to 61, where we list the country condition where mentally ill people are treated badly because of their mental illness, as well as administrative record pages 1099 to 1101, where attorney Derek Hensley explains how he would have tried this case if he were, if he had, Elvis as a client, and if a reasonable attorney had a client who had a disability, how that attorney would have tried this case. Thank you, your honors. Well, if you don't, if you don't mind, judge, you know, a lot of you, of course, please proceed. I just want to, I just want to be clear in terms of my position on this, you know, and this goes, I agree, we, you know, from a textualist perspective, those who choose to go that that way, you have a certain, you know, tie into how the statute reads, you know, and consistency, whether in criminal cases or dealing with other issues that come before us, we need to be consistent in how to do it. There are instances in which we look to, to see what the situation is. In cases like this, it is often difficult to predict what kind of safeguards would have been actually granted and just how those safeguards would have affected this non-citizen's ability to prove the essential elements of his claim during the proceeding. So here, a counsel's failure to secure the procedural safeguards for an incompetent person is, in my view, is somewhat akin to a structural error that defines or defies prejudicial analysis from the stringent way in which Judge Wilkerson wants to hold right to the letter of the statute. And I, and certainly it is there. I mean, it's certainly defensible. I'm not going to take that way from my friend at all. He's making a strong point, but because the lack of such safeguards here affects the whole framework from a structural procedure within the hearing proceedings, then that's the precise effects of this error that are necessarily unquantifiable and indeterminate. So, so, so, so I think that's where we are. And I, I, I'm okay with the, if we choose to be strict in our interpretation of statutes and contextual things, I, I just, you know, as a judge, I want to see it done in all cases. I don't want special cases coming up with criminals and others in which we do it differently. But here we've done this and we've done this in multiple cases of looking at it and seeing beyond here that there's a structural problem here. And it arises from this incompetency on the, or in, in effectiveness in terms of the counsel here, and then the incompetency of the, of the, of the petition here. So I wanted to add that to the record because I want to be clear, Judge Wilkerson, you and I are not at odds in terms of the way in which you're approaching that. I fully respect the manner in which you view this case, but I do think it is a very stringent way in which to do it and which I don't think we should carve out. If we're going to do it in this case, let's do it in every case. And, and, and, and I, and I know you believe in that too. Well, to me, it's a very important thing that there's an abusive discretion standard with respect to a motion to reopen. The motions to reopen are different, I think, from initial appeals from a denial of asylum and they're under an abusive discretion standard. And I think, I think that has to, I think that has to mean something, but I guess, you know, what I want to say is my colleague, Judge Wynn, is just to thank him for this spirited discussion or disagreement and just how much I respect the points that you've made, and I respect your eloquence and everything. And I simply regret the fact that we may have a, we may have a good faith disagreement, but I sure do respect the way you're coming from. And I want to, before I address counsel, I want to make sure that Judge Harris has asked some pertinent and helpful questions. I want to ask Judge Harris, do you have any further questions you would like to ask? No, thank you. All right. I would just like to thank counsel, both of you, for your helpful arguments and the preparation that you've put into the case. And I'm sorry that all three of us can't come down and greet you, but we're very appreciative of your arguments nonetheless.
judges: J. Harvie Wilkinson III, James A. Wynn Jr., Pamela A. Harris